**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| DRAPER FRANK WOODYARD, | ) | |
| AIS #00183250, | ) | |
|     Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 12-00566-WS-N |
| | ) | |
| TONY PATTERSON, *et al.*, | ) | |
|     Defendants. | ) | |

## <u>REPORT AND RECOMMENDATION</u>

Plaintiff Draper Frank Woodyard ("Woodyard"), an Alabama prisoner proceeding *pro se* and *in forma pauperis* (*see* Doc. 10), has brought this action asserting claims against the Defendants under 42 U.S.C. § 1983. Currently pending are the Defendants' Answer (Doc. 30) and Special Report (Doc. 29), which have been converted to a Motion for Summary Judgment under Federal Rule of Civil Procedure 56 by order of the undersigned (Doc. 31). Woodyard has filed a response in opposition (Doc. 42) to the motion. The motion for summary judgment is now under submission and ripe for adjudication. (*See* Doc. 44 at 3).

This matter has been referred to the undersigned United States Magistrate Judge for entry of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B), Federal Rule of Civil Procedure 72(b)(1), and SD ALA Local Rule 72.2(c)(4). Upon consideration, and for the reasons stated herein, it is **RECOMMENDED** that the Defendants' motion for summary judgment be **GRANTED in part** and **DENIED in part**, as set out.

# I.    <u>Summary Judgment Standards</u>

In analyzing the propriety of a motion for summary judgment, the Court begins with these basic principles. The Federal Rules of Civil Procedure grant this Court authority under Rule 56 to render "judgment as a matter of law" to a party who moves for summary judgment. Federal Rule of Civil Procedure 56(a) provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." In *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L .Ed. 2d 265 (1986), the Supreme Court held that summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact...." However, all of the evidence and factual inferences reasonably drawn from the evidence must be viewed in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970); *Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1280 (11th Cir. 2004).

Federal Rule of Civil Procedure 56(e) further provides:

If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may:

(1) give an opportunity to properly support or address the fact;

(2) consider the fact undisputed for purposes of the motion;

(3) grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it; or

(4) issue any other appropriate order.

The party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. The movant can meet this burden by presenting evidence showing there is no dispute of material fact or by pointing out to the district court that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Id.* at 322–25.

Once the moving party has satisfied its responsibility, the burden shifts to the non-movant to show the existence of a genuine issue of material fact. *See Stabler v. Fla. Van Lines, Inc.*, Civil Action No. 11–0103–WS–N, 2012 WL 32660, at *5 (S.D. Ala. Jan.6, 2012) (citing *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991)). Summary judgment is proper when "a party fails to make a showing sufficient to establish the existence of an essential element of that party's case." *McDowell v. Brown*, 392 F.3d 1283, 1288 (11th Cir. 2004) (citations and internal quotation marks omitted). "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.... If the evidence is merely colorable, ... or is not significantly probative,

... summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986) (internal citations omitted). "After the nonmoving party has responded to the motion for summary judgment, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *AGSouth Genetics, LLC v. Cunningham*, No. CA 09–745–C, 2011 WL 1833016, at *2 (S.D. Ala. May 13, 2011). " 'An issue of fact is "material" if, under the applicable substantive law, it might affect the outcome of the case. An issue of fact is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party.' " *Harrison v. Culliver*, 746 F.3d 1288, 1298 (11th Cir. 2014) (quoting *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259–60 (11th Cir. 2004) (citations omitted)).

"A document filed *pro se* is to be liberally construed, and a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers…" *E.g.*, *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (citation and quotations omitted). Nevertheless, "a court may not 'serve as de facto counsel for a party' or 'rewrite an otherwise deficient pleading in order to sustain an action.' " *Muhammad v. Bethel*, 430 F. App'x 750, 752 (11th Cir. 2011) (quoting *GJR Invs., Inc. v. Cnty. of Escambia, Fla.*, 132 F.3d 1359, 1369 (11th Cir. 1998), *overruled on other grounds*, *see Randall v. Scott*, 610 F.3d 701, 709 (11th Cir. 2010)). Additionally, "[t]here is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary

judgment. Rather, the onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned." *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) (*en banc*) (internal citation omitted). *Accord, e.g., Gennusa v. Canova*, 748 F.3d 1103, 1116 (11th Cir. 2014).

## II.    Determination of Facts[1]

Woodyard has been an inmate in the custody of the Alabama Department of Corrections ("ADOC") since August 8, 1995. (Doc. 29-1 at 2). Woodyard is currently housed at ADOC's Holman Correctional Facility ("Holman") in Atmore, Alabama, and has been at all relevant times in this action. On July 24, 2012, defendant Correctional Officer David Leggett ("Leggett") was assigned to Housing Unit A at Holman. (Doc. 29-2 [Leggett Aff.] at 1). Per an unsigned ADOC Incident Report from Woodyard's institutional file (Incident No. HCF-12-00883),[2] the following occurred on that date:

---

[1] The undersigned has made her "determination of facts" by "review[ing] the record, and all its inferences, in the light most favorable to [Woodyard,] the nonmoving party." *E.g., Benson v. Tocco, Inc.*, 113 F.3d 1203, 1207 (11th Cir. 1997). As such, this determination of "facts" is for summary judgment purposes only and may differ from the facts ultimately established at trial. *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994) ("As we said in *Swint v. City of Wadley*, 5 F.3d 1435, 1439 (11th Cir. 1993), 'what we state as "facts" in this opinion for purposes of reviewing the rulings on the summary judgment motion [ ] may not be the actual facts. They are, however, the facts for present purposes, and we set them out below.' "), *opinion modified on other grounds on reh'g*, 30 F.3d 1347 (11th Cir. 1994).

[2] The incident report and other documents have been certified as true and correct copies of documents contained in Woodyard's ADOC institutional file, and as documents "maintained in the usual and ordinary course of business[,]" by Kim Whitney. (Doc. 29-1 at 1 [Whitney Aff.]). Whitney's affidavit indicates that Whitney is an ADOC employee and is "competent to testify" regarding the documents. However, the affidavit does not state Whitney's

At approximately 12:15 PM, CO Leggett observed inmates Lawrence Anderson B/155259 and Draper Woodyard B/183250 engaged in a physical altercation near bed A-14. CO Leggett called a "Code Blue" via hand-held radio. CO Leggett gave inmates Woodyard and Anderson loud verbal orders to cease fighting. Both inmates failed to comply with the lawful order given by CO Leggett. As CO Leggett reached the area, other inmates had pulled inmates Woodyard and Anderson apart. Correctional Sergeant Ruby Salter along with Correctional Officers Kenneth Bates, Gary Scarbrough, Hunter Capps and John Jones responded to the code to provide assistance. CO Leggett observed inmate Woodyard bleeding profusely. CO Leggett assisted inmate Woodyard out of the dormitory, to the Health Care Unit. CO Bettis and Jones secured the dormitory and the crime scene area. CO Scarbrough escorted inmate Anderson to the Segregation Holding Area. Inmate Woodyard was medically assessed by Corizon Medical Services Licensed Practical Nurse, Shirley Johnson…Inmate Woodyard sustained several lacerations to his right arm, right chest, left chest, left arm, inner forearm, left palm, jagged laceration to his left 3rd finger and his 4th finger was nearly severed. Inmate Woodyard remained in the Health Care Unit for Observation, per order of Doctor Pamela Barber…At approximately 3:15 PM, Correctional Officer Letha Hartley (Health Care Officer) contacted CL Brown via telephone and requested that CL Brown report to the Health Care Unit. Upon arrival in the Health Care Unit, Doctor Barber informed CL Brown that inmate Woodyard needed to be transported via ambulance to Atmore Community Hospital, due to uncontrollable bleeding. At approximately 3:55 PM, Atmore Ambulance Services arrived at the backgate. CL Brown escorted Atmore Ambulance Attendants to the Health Care Unit. At approximately 4:12 PM, Atmore Ambulance Attendants departed the Health Care Unit with inmate Woodyard…

(Doc. 29-1 at 25-26).[3]

An investigation of the incident by prison officials determined that Woodyard instigated the incident by confronting Anderson with a knife over money allegedly owed to Woodyard by Anderson. Anderson then gained control of the knife and

___

position with ADOC or otherwise provide facts indicating why Whitney is competent to authenticate the documents from Woodyard's file.

[3] As a result of the attack, on July 25, 2012, Anderson was listed as a "known enemy" of Woodyard in ADOC records. (Doc. 29-1 at 20).

stabbed Woodyard. Anderson was also purportedly given another knife by another inmate. (Doc. 29-1 at 26).

In his complaint (Doc. 16[4]), Woodyard asserts that he was stabbed repeatedly by Anderson and that Leggett, despite being armed with a baton, a chemical agent, and handcuffs, ignored his yells for help. Woodyard claims that, "[p]rior to the actual assault occurring, [he] informed []Leggett that he had just passed words with Inmate Lawrence Anderson because[] Inmate Anderson wanted [Woodyard] to give him money[,]" and that "he feared life threatening violence to befall him" from Anderson. (Doc. 16 at 4-5). Additionally, Woodyard claims that, "minutes" before the attack, he "asked Defendant Leggett…if he could report the incident to the shift commander[,]" with Leggett responding that " 'the yard call was over' and that [Woodyard] 'had to wait on the next movement call[.]' " (*Id.* at 8).

Woodyard asserts that there are no security measures at Homan to monitor or control tools such as hacksaws being circulated among the inmates. The hacksaws are purportedly used to saw metal hinges from locker boxes. The hinges themselves are then fashioned into weapons by the inmates. Woodyard asserts that

---

[4] Woodyard's operative Complaint is signed and dated by him and states that, "[b]y my signature below, I swear or affirm under penalty of perjury that the facts set out in this complaint are true and correct." (Doc. 16 at 7). Though the Complaint is not notarized, it is in substantial compliance with 28 U.S.C. § 1746 and thus constitutes an unsworn declaration under penalty of perjury that may be considered for purposes of summary judgment. *See Perry v. Thompson*, 786 F.2d 1093, 1095 (11th Cir. 1986) (*per curiam*) ("Plaintiff alleged specific facts in his sworn complaint and they were required to be considered in their sworn form."); *Moulds v. Bullard*, 345 F. App'x 387, 391 (11th Cir. 2009) (*per curiam*) ("In another prisoner's § 1983 case, we held that specific facts pled in a sworn complaint must be considered in opposition to summary judgment. *Perry v. Thompson,* 786 F.2d 1093, 1095 (11th Cir. 1986). However, sworn statements must be made on personal knowledge, and statements based in part upon information and belief cannot raise a genuine issue of fact. *Pace v. Capobianco,* 283 F.3d 1275, 1278 (11th Cir. 2002) (citing Fed. R. Civ. P. 56(e)).").

the Defendants are aware of this problem but have failed to take any measures to stop or prevent it. He also asserts that the Holman guards themselves are not trained to properly respond to inmate-on-inmate violence.

It is undisputed also that, since the attack, Woodyard and Anderson continue to be housed in the same annex of Holman, with both being kept in segregation/close status.

### III. <u>Claims</u>[5]

In this action, Woodyard asserts claims under 42 U.S.C. § 1983[6] for alleged deprivations of his constitutional rights related to the above-described attack by inmate Anderson occurring July 24, 2012.

---

[5] Woodyard's operative Complaint (Docs. 16, 17; *see also* Doc. 20 & Doc. 22 n.1 (identifying Docs. 16 and 17 as "constitute[ing] the complaint in this action…") is the sole source of any of his claims in this action. Claims raised for the first time in Woodyard's summary judgment briefing will not be addressed. *See Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004) ("At the summary judgment stage, the proper procedure for plaintiffs to assert a new claim is to amend the complaint in accordance with Fed. R. Civ. P. 15(a). A plaintiff may not amend h[is] complaint through argument in a brief opposing summary judgment."). Moreover, "[l]iberal pleading does not require that, at the summary judgment stage, defendants must infer all possible claims that could arise out of facts set forth in the complaint." *Id. See also Al-Amin v. Donald*, 165 F. App'x 733, 740 (11th Cir. 2006) (*per curiam*) ("*Pro se* pleadings are interpreted liberally, but even a *pro se* plaintiff must allege some factual basis for his claim. *See Jones v. Ray,* 279 F.3d 944, 946-47 (11th Cir. 2001). A defendant is not required to 'infer all possible claims that could arise out of the facts set forth in the complaint.' *Gilmour v. Gates, McDonald, & Co.,* 382 F.3d 1312, 1315 (11th Cir. 2004).").

[6]

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress…

42 U.S.C. § 1983.

1.     Officer Leggett – Leggett is the only Defendant alleged to have been present during the attack on Woodyard.   Woodyard alleges claims against Leggett for "deliberate indifference to [Woodyard's] right to safety and protection" under the Eighth Amendment and for "failure to protect."   Specifically, Leggett is alleged to have "ignored [Woodyard's] yells for help and watched as [Woodyard] was stabbed repeatedly[,]" despite Leggett being armed with chemical agents, a baton, and handcuffs.   Shortly prior to the assault, Woodyard allegedly informed Leggett that "he had just passed words with Inmate Lawrence Anderson because, Inmate Anderson wanted [Woodyard] to give him money" and that Woodyard "feared life threatening violence to befall him (from his attack)," but Leggett "did nothing to prevent the attack from occurring." Leggett also purportedly "refused to let [Woodyard] report the situation to the on duty supervisor…" (Doc. 16 at 4-5, 8).

2.     Tony Patterson, Gwendolyn Givens, Jesse Walter Bishop, Ronzella Howard (collectively, "the Supervisor Defendants") – In addition to claims for failure to protect from and prevent harm, Woodyard alleges claims against the Supervisor Defendant for "lack of security" and (with the exception of Ronzella Howard) "failure to train" (*see* Doc. 17 at 1).   Woodyard does not claim that the Supervisor Defendants "participated directly in the unconstitutional conduct" – that is, that they were present at the time of the attack but failed to prevent it or to intervene.   Rather, his allegations as to these Defendants, when read together, can be distilled as follows: 1) by failing "to regulate, monitor or control the tools needed to manufacture weapons" (specifically, hacksaw blades that are "only accessible

through the institutions maintenance shop" and are used to remove steel hinges from locker boxes, which themselves are fashioned into "crude weapons" such as knives and shanks), and 2) by failing to properly train the prison guards under their command to handle prisoner-on-prisoner assaults, the Supervisor Defendants created prison conditions that presented a substantial risk of serious harm, and these Defendants were deliberately indifferent to the substantial risk that inmates would inflict serious harm on each with these weapons.[7] (*See* Docs. 16 – 17).

Woodyard also appears to allege that the Supervisor Defendants are also showing deliberate indifference to a substantial risk of serious harm by continuing to house him in the same annex as his attacker, Anderson, and forcing him to "exercise on the same exercise yard as his attacker, only a few exercise cages away." (*See* Docs. 16 – 17).

Finally, Woodyard alleges "retaliation" against Patterson and Howard (Doc. 16 at 5, 16). Specifically, as to Patterson, Woodyard alleges that he "was found not guilty on his disciplinary by a sanctioned fact finder" and "[y]et [he] was still placed in closed custody for a minimum of 12 months (1 year) for no rule violation" and "is being forced to endure hardships imposed by the Defendant Patterson for no rule

---

[7] *Cf. Harrison v. Culliver*, 746 F.3d 1288, 1299 (11th Cir. 2014) ("Harrison raises two claims against the defendants, one related to the alleged failure to provide adequate security on the back hallway and the other related to the alleged failure to secure hobby craft tools. The Magistrate Judge analyzed Harrison's claim against defendants as two separate counts, likely because that is how Harrison presented the claim in his complaint. However, Harrison was a *pro se* plaintiff, and a more charitable reading of the complaint can be distilled as follows: by failing to provide adequate security on the back hallway and by failing to implement and enforce policies regarding the use of utility knives in the hobby shop, the defendants created prison conditions that presented a substantial risk of serious harm, and the defendants were deliberately indifferent to the substantial risk that inmates would inflict serious harm on each other in the back hallway via box-cutter type weapons.").

violation…" (Doc. 16 at 8-9). As to Howard, Woodyard alleges that Howard "has threatened retaliation against [him] by stating 'If you keep bothering me about moving, you will be wrote a disciplinary and that's just the beginning.'" (Doc. 16 at 16).

Woodyard seeks compensatory and punitive damages, costs and legal fees, and "corrective surgery on his impaired left hand to restore full function." (Doc. 16 at 7. *See also* Doc. 17 at 3-4 ("Defendants are being sued…for monetary damages…Plaintiff seeks monetary compensation in the amount of $200,000.00 in compensatory and punitive damages and corrective surgery for his impaired left arm and hand. Monetary compensation for emotional distress and mental anguish are to total into the $200,000.00 Plaintiff is seeking.")).[8]

## IV.   Analysis

The Defendants assert that they are due summary judgment on Woodyard's claims against them because they are protected by the affirmative defense of qualified immunity.[9]

---

[8] By separate motions, Woodyard sought a preliminary injunction and restraining order directing ADOC to remove him from any proximity to his attacker. (*See* Docs. 4, 13). On August 5, 2013, the Court denied Woodyard a preliminary injunction. (Doc. 52). Though Woodyard appealed that decision (*see* Doc. 55), that appeal was dismissed on May 27, 2014, for want of prosecution. (Doc. 63).

[9]    Woodyard expressly states that he is suing all Defendants "in their individual capacities under 1983 for monetary damages…" (Doc. 17 at 3). Moreover, while he includes ADOC as a defendant in the style of both documents comprising his operative Complaint (*see* Doc. 16 at 1; Doc. 17 at 1), he makes no substantive claims against ADOC in either document.

However, even if Woodyard is asserting claims against ADOC and/or the prison official Defendants in their official capacities, such claims are barred by sovereign immunity under the Eleventh Amendment. *See, e.g., Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984) (With some exceptions, "a suit in which the State or

Qualified immunity protects government officials from liability for civil damages unless they violate a statutory or constitutional right that was clearly established at the time the alleged violation took place. *See Pearson v. Callahan,* 555 U.S. 223, 231, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009); *Amnesty Int'l, USA v. Battle,* 559 F.3d 1170, 1184 (11th Cir. 2009). "The purpose of [qualified] immunity is to allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation, protecting from suit 'all but the plainly incompetent or one who is knowingly violating the federal law.' " *Lee[ v. Ferraro],* 284 F.3d [1188,] 1194 [(11th Cir. 2002) ](citation omitted) (quoting *Willingham v. Loughnan,* 261 F.3d 1178, 1187 (11th Cir. 2001)). Qualified immunity is a defense not only from liability, but also from suit… *See id.*

"Under the well-defined qualified immunity framework, a 'public official must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred.' " *Terrell v. Smith,* 668 F.3d 1244, 1250 (11th Cir. 2012) (quoting *Lee,* 284 F.3d at 1194). Once the official has done so, the burden shifts to the plaintiff to satisfy the following two-pronged inquiry: (1) whether the facts that a plaintiff has shown make out a violation of a constitutional right; and (2) whether the right at issue was clearly established at the time of the defendant's alleged misconduct. *Pearson,* 555 U.S. at 232, 129 S. Ct. 808…The Supreme Court recently has made it clear that [courts] need not employ a rigid two-step procedure, but rather may exercise [their] discretion to decide "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.* at 236, 129 S. Ct. 808.

*Gilmore v. Hodges*, 738 F.3d 266, 272-73 (11th Cir. 2013).

"The inquiry whether a federal right is clearly established must be undertaken in light of the specific context of the case, not as a broad general

---

one of its agencies or departments is named as the defendant is proscribed by the Eleventh Amendment. This jurisdictional bar applies regardless of the nature of the relief sought." (citations omitted)); *Harbert Int'l, Inc. v. James,* 157 F.3d 1271, 1277 (11th Cir. 1998) ("[S]tate officials sued in their official capacity are []protected by the [Eleventh A]mendment." (citing *Kentucky v. Graham*, 473 U.S. 159, 165 (1985))). In addition, "a state agency[] and a state official sued in his official capacity are not 'persons' within the meaning of § 1983, thus damages are unavailable…" *Edwards v. Wallace Cmty. Coll.*, 49 F.3d 1517, 1524 (11th Cir. 1995) (citing *Will v. Michigan Department of State Police*, 491 U.S. 58, 71 (1989)).

proposition. The relevant, dispositive inquiry in determining whether a right is *clearly* established is whether it would be *clear* to a reasonable state official that his conduct was unlawful in the situation he confronted." *Loftus v. Clark-Moore*, 690 F.3d 1200, 1204 (11th Cir. 2012) (internal citation and quotations omitted). While a plaintiff "need not demonstrate that there is case-law specifically addressing his factual scenario, 'existing precedent must have placed the statutory or constitutional question beyond debate.'" *Morris v. Town of Lexington Alabama*, 748 F.3d 1316, 1322 (11th Cir. 2014) (quoting *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2083 (2011)).

> [A] plaintiff[] can demonstrate that the contours of the right were clearly established in several ways. First, the plaintiff[] may show that "a materially similar case has already been decided." *Mercado v. City of Orlando,* 407 F.3d 1152, 1159 (11th Cir. 2005) (citing *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982)). Second, the plaintiffs can point to a "broader, clearly established principle [that] should control the novel facts [of the] situation." *Id.* (citing *Hope,* 536 U.S. at 741, 122 S. Ct. 2508). Finally, the conduct involved in the case may "so obviously violate[ ] th[e] constitution that prior case law is unnecessary." *Id.* (citing *Lee[ v. Ferraro],* 284 F.3d [1188,] 1199 [(11th Cir. 2002)]). Under controlling law, the plaintiffs must carry their burden by looking to the law as interpreted at the time by the United States Supreme Court, the Eleventh Circuit, or [the highest court of the state from which the case arose]. *See id.*

*Terrell v. Smith*, 668 F.3d 1244, 1255-56 (11th Cir. 2012). *Accord Morris*, 748 F.3d at 1322. "Any case law that a plaintiff relies upon to show that a government official has violated a clearly established right must pre-date the officer's alleged improper conduct, involve materially similar facts, and truly compel the conclusion that the plaintiff had a right under federal law." *Ensley v. Soper*, 142 F.3d 1402, 1406 (11th Cir. 1998) (quotation marks omitted)

The record evidence amply supports the determination that all Defendants were acting within the scope of their discretionary authority as prison officials at the time of the wrongful acts at issue, and Woodyard offers no evidence or argument to dispute this. Accordingly, the burden shifts to Woodyard to show, via the two-pronged analysis discussed above, why the Defendants are not due qualified immunity.

### a. Deliberate Indifference in Failure to Protect from/Prevent Harm

Prison officials have an obligation to protect prisoners from violence inflicted upon them by other prisoners. "It is not, however, every injury suffered by one prisoner at the hands of another that translates into constitutional liability for prison officials responsible for the victim's safety." *Farmer v. Brennan,* 511 U.S. 825, 834, 114 S. Ct. 1970, 1977, 128 L.Ed.2d 811 (1994). Prison officials must "take reasonable measures to guarantee the safety of the inmates." *Hudson v. Palmer,* 468 U.S. 517, 526–27, 104 S. Ct. 3194, 3200, 82 L. Ed. 2d 393 (1984). Only "[a] prison official's deliberate indifference to a known, substantial risk of serious harm to an inmate violates the Eighth Amendment." *Marsh v. Butler Cnty., Ala.,* 268 F.3d 1014, 1028 (11th Cir. 2001) (en banc).

Thus, a prisoner-plaintiff must first demonstrate "an objectively substantial risk of serious harm to prisoners." *Id.* at 1028–29. Then, the plaintiff must show that the defendant was deliberately indifferent, which requires the following: "(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than gross negligence." *Goodman v. Kimbrough,* 718 F.3d 1325, 1331–32 (11th Cir. 2013) (internal quotation marks omitted).

*Harrison v. Culliver*, 746 F.3d 1288, 1298 (11th Cir. 2014). *Accord, e.g.*, *Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1099 (11th Cir. 2014) ("To survive summary judgment on a deliberate indifference failure-to-protect claim, 'a plaintiff must produce sufficient evidence of (1) a substantial risk of serious harm; (2) the defendants' deliberate indifference to that risk; and (3) causation.' " (quoting

*Goodman v. Kimbrough*, 718 F.3d 1325, 1331 (11th Cir. 2013) (internal quotation marks omitted)).[10]

### 1.    Officer Leggett

Via affidavit, Leggett avers: "At no time did inmate Woodyard report any concern to me that he was in danger...I did hear an inmate yell.  Upon locating the area of the disturbance, I called for assistance for additional staff to report to Housing unit A.  When I arrived on the scene I order [sic] the inmates to 'stop fighting'.  The inmates disengaged from the unlawful behavior..."  (Doc. 29-2 at 2). However, at this stage, Woodyard's evidence is to be believed, and the record is to be viewed in the light most favorable to him.  *Cf. Harrison*, 746 F.3d at 1294 n.5 ("Warden Culliver disputes that the back hallway is not monitored 24 hours a day, but because we are reviewing the District Court's grant of summary judgment, we view all facts in favor of the nonmoving party, Harrison.")

---

[10] The Defendants oversimplify the law governing deliberate inference failure-to-protect claims in asserting that "the law is clear that Eighth Amendment deliberate indifference claims are subjective in nature" and that "the United States Supreme Court has expressly rejected an objective test in deliberate indifference cases" (Doc. 29 at 9 (citing *Farmer*, 511 U.S. at 837)).  *See Caldwell*, 748 F.3d at 1099 ("When examining the first element—a substantial risk of serious harm—the court uses an **objective** standard.  The second element—the defendant's deliberate indifference to that risk—has two components: one subjective and one **objective**. To satisfy the subjective component, a plaintiff must produce evidence that the defendant actually (subjectively) knew that an inmate faced a substantial risk of serious harm.   To satisfy the **objective** component, a plaintiff must produce evidence that the defendant disregard[ed] that known risk by failing to respond to it in an (**objectively**) reasonable manner." (internal citations and quotations omitted) (emphasis added)); *Johnson v. Boyd*, No. 12-16181, 2014 WL 2523832, at *1 (11th Cir. June 5, 2014) (unpublished) ("When examining the existence a substantial risk of serious harm, the district court uses an **objective** standard...Determining whether the defendant was deliberately indifferent to a risk of injury involves a subjective and **objective** component. (citing *Caldwell*) (emphasis added)).

In his operative Complaint, Woodyard claims that, "[p]rior to the actual assault occurring, [he] informed []Leggett that he had just passed words with Inmate Lawrence Anderson because[] Inmate Anderson wanted [Woodyard] to give him money[,]" and that "he feared life threatening violence to befall him" from Anderson. (Doc. 16 at 4-5). Additionally, Woodyard claims that, "minutes" before the attack, he "asked Defendant Leggett...if he could report the incident to the shift commander[,]" with Leggett responding that " 'the yard call was over' and that [Woodyard] 'had to wait on the next movement call[.]' " (*Id*. at 8).

In his (unsworn) brief in response to the motion for summary judgment, Woodyard also claims that Anderson "walked by Defendant Leggett with the weapon in plain view of the defendant (Leggett) yet defendant did not call the code for help immediately nor, did he (Leggett) use the weapons he was armed with to disable inmate Anderson." (Doc. 42 at 13). Woodyard has submitted an affidavit from Anderson, his attacker, who confirms that, prior to the attack, he "walked by the officer with the weapon out" and that "the officer saw the knife and looked the other way..." (Doc. 42 at 18). Kenyatta McMillan, another inmate who claims to have witnessed Anderson's attack on Woodyard, avers that Leggett "froze[] starring at the incident before him" after Woodyard first called for help. (Doc. 42 at 19). McMillan purportedly witnessed Woodyard "f[i]ght for his life for what seemed like to be 5 minutes before the officer even radioed for help." (*Id*.). McMillan also avers that Leggett "was armed with a can of mace and an extendable baton and used neither in the defense of inmate Woodyard." (*Id*.). McMillian claims he went over

and pushed Anderson off of Woodyard and that "[b]y the time he was getting up other officers was comming [sic] in & got control of the situation." (*Id.*).

"Merely negligent failure to protect an inmate from attack does not justify liability under section 1983…The known risk of injury must be a strong likelihood, rather than a mere possibility before a guard's failure to act can constitute deliberate indifference." *Brown v. Hughes*, 894 F.2d 1533, 1537 (11th Cir. 1990) (*per curiam*) (quotations omitted). Woodyard is also "required to produce evidence that, with knowledge of the substantial risk of serious harm, [Leggett] knowingly or recklessly 'disregard[ed] that risk by failing to take reasonable measures to abate it.'" *Hale v. Tallapoosa Cnty.*, 50 F.3d 1579, 1583 (11th Cir. 1995) (quoting *Farmer v. Brennan,* 511 U.S. 825, 847 (1994)). *See also Rodriguez v. Sec'y for Dep't of Corr.*, 508 F.3d 611, 619-20 (11th Cir. 2007) (" '[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted.' More succinctly, 'prison officials who act reasonably cannot be found liable under the Cruel and Unusual Punishments Clause.'" (quoting *Farmer*, 511 U.S. at 844-45) (internal citation omitted)).

In *Brown*, the Eleventh Circuit, reviewing a district court's grant of summary judgment in favor of a defendant prison guard on the prisoner plaintiff's failure-to-protect claim, set forth the following relevant facts:

> On May 31, 1987, Arlington Brown was an inmate of the Hamilton County Jail in Jasper, Florida. That morning he went to speak to Sergeant Chris Hughes about a "racial problem" in his cell. As he spoke to Hughes the officer appeared to ignore him. Brown was then

told that he would have to see the Captain if he wanted a cell change.[FN2] Hughes sat down at the booking desk and began working on the computer there, and Brown returned to his cell.

> FN2 – Sergeant Hughes states in his affidavit that he was busy processing other inmates and securing them in cellblocks when he was approached by Brown. Hughes claims that he told Brown that he would talk to him later about the problem in Brown's cell.

Shortly after 10:30 a.m. Brown was attacked from behind by another inmate, and a fight ensued. During the scuffle Brown suffered two broken bones in his left foot and a cut under his right eye.

*Id.* at 1536 & n.2.

In holding that Brown had "failed to offer sufficient evidence that any defendant was aware or should have been aware of a strong likelihood that Brown would be assaulted[,]" the Eleventh Circuit noted:

> The only warning of trouble was Brown's statement to Sergeant Hughes that there was a "racial problem" in his cell. **Brown did not say that he had been threatened, or that a fight was imminent, or that he feared an attack, nor is there evidence that racial tensions in the jail frequently resulted in violence.** After Sergeant Hughes indicated that he was not going to do anything about the problem right away, Brown apparently returned to his cell voluntarily. In retrospect and with all the benefit of hindsight, we know today that a prompt response by Hughes to Brown's request for a transfer would have prevented Brown's injuries. Nevertheless, we cannot say that Sergeant Hughes' refusal to act under the circumstances constituted deliberate indifference to Brown's safety and rendered his confinement cruel or unusual.

*Id.* (emphasis added). Unlike Brown, Woodyard's report of trouble to Leggett – that he and Anderson had "passed words" over Anderson demanding money – was accompanied by the claim that Woodyard "feared life threatening violence to befall

18

him" from Anderson.[11]  Additionally, Woodyard has presented evidence indicating

that, shortly before the attack, Leggett witnessed Anderson openly carrying a knife

---

[11]     "Although relevant, a claimant's 'failure to give advance notice [of an attack] is not dispositive[.]' Thus, an official may not escape liability merely by showing that he did not know the claimant was likely to be assaulted or that an assault would be committed by the specific prisoner who eventually committed the assault."  *Hale v. Tallapoosa Cnty.*, 50 F.3d 1579, 1583 (11th Cir. 1995) (citing *Farmer*, 114 S. Ct. at 1982, 1984) (first alteration in original) (internal citation omitted).

Nevertheless, the Eleventh Circuit has repeatedly found a prisoner's informing prison officials of threats or of being in fear for his life (or the failure to do so) to be a significant factor in assessing failure-to-protect claims.  *Compare Brown*, 894 F.2d at 1537, *supra*; *Carter v. Galloway*, 352 F.3d 1346, 1349-50 (11th Cir. 2003) (*per curiam*) ("Defendant Galloway, serving as a Deputy Warden, heard many complaints from Plaintiff. But Plaintiff never told Galloway that Plaintiff feared Barnes or that Barnes clearly threatened Plaintiff."); *Chatham v. Adcock*, 334 F. App'x 281, 293-94 (11th Cir. 2009) (*per curiam*) ("Likewise here, although Plaintiff asserts that Hardy threatened him repeatedly in the days before the assault, Plaintiff has not identified any specific 'serious threat' from Hardy, which he then reported to Sgt. Homer, Col. Adcock, or any other Jail officer prior to July 12, 2005. *See Carter,* 352 F.3d at 1350 (discussing 'serious threat' requirement and noting that 'derogatory and argumentative statements' are not equivalent to threats). The only specific threat that Plaintiff sets forth in the record is Hardy's alleged threat on the morning of July 12, 2005, shortly before the assault occurred, that he would 'swing on' Plaintiff, by which time it was too late for Sgt. Homer, who was not on duty at the time, or Col. Adcock, who did not personally witness the threat, to do anything to help Plaintiff. [*See* Pf.'s Aff. ¶ 50; *see also* Doc. 8-2, Part IV attach, ¶¶ 19-20 (alleging that on or about July 5, 2005, after Roberts had been transferred, Plaintiff 'began receiving renewed threats' from Hardy, and that on July 12, 2005, approximately thirty minutes before the assault, Hardy threatened Plaintiff in the breakfast line, 'attempted a sneak attack from behind on Plaintiff,' and spit on Plaintiff 'in plain view' of three officers).]"); *and Longmire v. McKee*, No. 2:13-CV-330-MEF, 2014 WL 1328135, at *4 (M.D. Ala. Mar. 31, 2014) ("Based on *Carter,* the inmates' statements alleged in Longmire's complaint are insufficient for deliberate indifference. The statements to McKee that the inmates would 'take care of [Longmire] for you' and 'straighten [Longmire] out' do not create a plausible claim that McKee actually drew the inference that the statements constituted a threat creating a substantial risk of harm, as required by *Farmer.*  There is no allegation that Longmire told McKee that the statements were a threat or that he sought protection from the inmates."); *with Rodriguez v. Sec'y for Dep't of Corr.*, 508 F.3d 611, 621-22 & n.17 (11th Cir. 2007) ("Johnson relies exclusively on our decision in *Carter v. Galloway,* 352 F.3d 1346 (11th Cir. 2003), to support his argument that Rodriguez's complaints were too vague to put Johnson on actual notice of a substantial risk of harm. *Carter* does not help Johnson. In *Carter* an inmate was stabbed with a shank by a fellow inmate with whom he had been placed. The inmate then sued various prison officials under the Eighth Amendment for failing to prevent the stabbing, arguing that he had made the officials sufficiently aware of the risk of harm, yet they failed to act. We rejected the inmate's claims on the ground that the comments he made to the officials were too vague to show that the officials had 'actual

but did nothing about it. The Defendants appear to argue that "Officer Leggett

---

knowledge' of a substantial risk of serious harm. *Id.* at 1350. Specifically, we noted that the only complaints the inmate made to prison officials were that the attacker-inmate (1) paced his cell like a wild animal, (2) wanted to fake a hanging in order to secure a transfer, and (3) told the plaintiff-inmate that he would help the attacker-inmate carry out the fake hanging "one way or another.' *Id.* at 1349. In rejecting his Eighth Amendment claims, we expressly relied upon the fact that the inmate never told prison officials that he 'feared' his attacker, never told them that he had been 'clearly threatened,' and never asked to be placed in 'protective custody.' *Id.* at 1349, 1350. In short, we concluded: 'Plaintiff has failed to establish that either Defendant had a subjective awareness of a substantial risk of serious physical threat to Plaintiff.' *Id.* at 1350. *Carter* is thus easily distinguishable on its facts. []Here, unlike in Carter, Rodriguez told Johnson the following specific information: (1) that he was a former Latin King who decided to renounce his membership; (2) that members of the Latin Kings had threatened to kill him when he returned to the compound in retaliation for his renunciation; (3) that the compound at ECI was heavily populated with Latin Kings; and (4) that, in order to prevent an attempt on his life, he needed either to be transferred to another institution or to be placed in protective custody. These are the things that the inmate in Carter did not do... Kugler's (and the district court's) reliance on Carter is similarly misplaced. Rodriguez on at least two separate occasions told Kugler that gang members had made threats on his life and requested that Kugler place him in protective custody or recommend that he be transferred from ECI...A reasonable juror could find from this evidence that Johnson actually knew that Rodriguez faced a substantial risk of serious harm."), *and Caldwell*, 748 F.3d at 1101 ("A reasonable jury could infer...that the defendants knew that inmate Pinson had a violent past, was very disruptive, and needed greater management. They knew that inmate Pinson started a dangerous cell fire that endangered his life and Caldwell's life and that Pinson expressed no regret at having endangered Caldwell's life or safety. And, because inmate Pinson used Caldwell's personal photographs and papers to start the fire, the defendants knew that it was possible that inmate Pinson was targeting Caldwell with his unsafe actions. **They also knew that Caldwell feared for his life if he was returned to a cell with inmate Pinson. And, a jury could reasonably infer from the facts preceding Caldwell's expression of fear that Caldwell had a well-founded basis for his fear.** []The defendants argue that the cell fire was just as likely to harm inmate Pinson as plaintiff Caldwell, and, therefore, the defendants did not have notice that inmate Pinson would try to harm Caldwell specifically. However, the fact that inmate Pinson was willing to put his own life in jeopardy does not diminish the fact that he also jeopardized Caldwell's life by setting the locked cell on fire. Nor does it negate the defendants' knowledge of inmate Pinson's history of violence. And, it does not diminish the reasonable inferences drawn from the fact that inmate Pinson intentionally burned Caldwell's personal effects in the fire. Those facts, **viewed together with Caldwell's repeated statements that he feared (and had reason to fear) for his life if he was locked back in a locked cell with inmate Pinson**, are sufficient to allow a jury to infer that the defendants actually knew that Caldwell faced a substantial risk of serious harm if he was returned to a cell with inmate Pinson." (emphasis added)).

responded to the incident" reasonably, though after the fact, "by issuing a radio call for assistance and issuing verbal orders for the inmates to stop." (Doc. 29 at 10). However, the record evidence, when viewed in the light most favorable to Woodyard, establishes that Leggett was made aware, prior to the attack, of a substantial risk of serious harm to Woodyard from Anderson but knowingly or recklessly failed to take any steps to abate that risk until it became a reality.

Like Woodyard, in *McBride v. Rivers*, 170 F. App'x 648 (11th Cir. 2006) (*per curiam*) the plaintiff inmate, "in responding to the defendants' motion for summary judgment[ on his deliberate indifference failure-to-protect claim], []argued that the defendants knew of the risk of serious harm in placing him in the same cell as [his inmate attacker,] Holmes because, immediately before being placed in a cell with Inmate Holmes, he told them that he feared for his life." 170 F. App'x at 655. The Eleventh Circuit, however, noted that the plaintiff had "testified during his deposition that his only statements to the defendants relating to his safety included his general request that they not place him in a cell with anyone whom he might have problems, and his statement, upon seeing Inmate Holmes, that 'me and that dude had problems. I'm in fear for my life. Don't put me in the cell with him.'" *Id.* The court further noted that the plaintiff "conceded that, after he was placed in the cell, he started the altercation by pushing Inmate Holmes." *Id.* As such, the court concluded, the plaintiff "did not identify a specific prior incident, from which the defendant could infer that a substantial risk existed" and thus "failed to show that

the defendants had subjective knowledge of a risk of serious harm." *Id.* (citing *Carter*, 352 F.3d at 1349).

The record in the present action is distinguishable from that in *McBride*. Here, Woodyard has presented evidence that he identified to Leggett a specific prior incident with Anderson that purportedly put him in fear for his life – an argument with Anderson over money occurring the same day as the attack. Woodyard also avers he asked Leggett that the confrontation be reported to the shift supervisor but Leggett refused. Additionally, the record evidence indicates an issue of fact as to whether Anderson or Woodyard attacked first.

"Prior to the conduct in this case, [the Eleventh Circuit] already clarified that a prison guard violates a prisoner's Eighth Amendment right when that guard actually (objectively and subjectively) knows that one prisoner poses a substantial risk of serious harm to another, yet fails to take any action to investigate, mitigate, or monitor that substantial risk of serious harm." *Caldwell*, 748 F.3d at 1102 (citing *Cottone v. Jenne*, 326 F.3d 1352, 1358-60 (11th Cir. 2003); *Hale v. Tallapoosa Cnty.*, 50 F.3d 1579, 1584 (11th Cir. 1995); and *LaMarca v. Turner*, 995 F.2d 1526, 1536–38 (11th Cir. 1993)). As such, 1) because Woodyard has presented sufficient evidence to make out a claim of deliberate indifference by Leggett in violation of the Eighth Amendment, and (2) because that right was clearly established at the time of Leggett's alleged misconduct, Leggett is not entitled to qualified immunity as to this claim. Thus, the undersigned **RECOMMENDS** that summary judgment be

**DENIED** as to Woodyard's failure-to-protect deliberate indifference claim against

Leggett.

## 2. Supervisor Defendants

"It is well established in this Circuit that supervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates on the basis of respondeat superior or vicarious liability." *Cottone v. Jenne,* 326 F.3d 1352, 1360 (11th Cir. 2003) (internal quotation marks omitted). Therefore, a plaintiff seeking to hold a supervisor liable for constitutional violations must show that the supervisor either participated directly in the unconstitutional conduct or that a causal connection exists between the supervisor's actions and the alleged constitutional violation. *Id.*

> The necessary causal connection can be established when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so. Alternatively, the causal connection may be established when a supervisor's custom or policy ... result[s] in deliberate indifference to constitutional rights or when facts support an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so.

*Id.* (alterations in original) (internal quotation marks omitted) (citations omitted). "The deprivations that constitute widespread abuse sufficient to notify the supervising official must be obvious, flagrant, rampant and of continued duration, rather than isolated occurrences." *Hartley v. Parnell,* 193 F.3d 1263, 1269 (11th Cir. 1999) (internal quotation mark omitted). In other words, "the standard by which a supervisor is held liable in [his] individual capacity for the actions of a subordinate is extremely rigorous." *Cottone,* 326 F.3d at 1360 (internal quotation marks omitted).

*Harrison*, 746 F.3d at 1298-99. *Accord, e.g.*, *Keith v. DeKalb Cnty., Georgia*, 749

F.3d 1034, 1047-48 (11th Cir. 2014).

As previously stated, Woodyard's claims against the Supervisor Defendants

can be distilled as follows: 1) by failing "to regulate, monitor or control the tools

needed to manufacture weapons" (specifically, hacksaw blades that are "only accessible through the institutions maintenance shop" and are used to remove steel hinges from locker boxes, which themselves are fashioned into "crude weapons" such as knives and shanks), and 2) (with the exception of Howard) by failing to properly train the prison guards under their command to handle prisoner-on-prisoner assaults, the Supervisor Defendants created prison conditions that presented a substantial risk of serious harm, and these Defendants were deliberately indifferent to the substantial risk that inmates would inflict serious harm on each with these weapons.[12] Woodyard also claims that these Defendants are showing deliberate indifference by continuing to house him in the same annex as Anderson following the attack. (*See* Docs. 16 – 17).

During discovery, the undersigned granted Woodyard motion "to subpoena records which report 'the actual number of fights with and without weapons and assaults that have occurred within the Annex and on the exercise yard from 2003 to 2013'…" (Doc. 44 at 3 (quoting Doc. 41)). The Defendants responded to this order as follows:

---

[12] *Cf. Harrison*, 746 F.3d at 1299 ("Harrison raises two claims against the defendants, one related to the alleged failure to provide adequate security on the back hallway and the other related to the alleged failure to secure hobby craft tools. The Magistrate Judge analyzed Harrison's claim against defendants as two separate counts, likely because that is how Harrison presented the claim in his complaint. However, Harrison was a *pro se* plaintiff, and a more charitable reading of the complaint can be distilled as follows: by failing to provide adequate security on the back hallway and by failing to implement and enforce policies regarding the use of utility knives in the hobby shop, the defendants created prison conditions that presented a substantial risk of serious harm, and the defendants were deliberately indifferent to the substantial risk that inmates would inflict serious harm on each other in the back hallway via box-cutter type weapons.").

…Records of this type dating from 2003 to 2007 do not currently exist in any form and are unable to be produced by the Defendants. Records of this type dating from 2007 until August, 2010 only exist in paper form, in boxes stored at Holman Correctional Facility. The documents, stored in date order, and would have to be hand-reviewed for records related to these specific types of incidents in the areas outlined in the request. The records would then have to be removed from storage, scanned, redacted, and returned to storage in the proper order. Defendants believe this request would constitute an undue burden, and that records prior to 2010 would not be relevant to Plaintiff's assertions.

[]As to records of this type from August, 2010 to the present date,[[13]] Defendants conducted a search of the electronically stored Incident Reports for incidents at Holman involving fighting with a weapon, fighting without a weapon, and inmate-on-inmate assaults[3]. Those records were then sorted for incidents which occurred within the Segregation Unit/Annex and the Segregation Exercise Yard. Pursuant to that search, Defendants are producing eight (8) incident reports responsive to the request, as ordered.

> [3] The search omitted records of inmate-on-staff assaults because they are irrelevant to Plaintiff's claims that he is in danger of being assaulted by another segregation unit inmate. By the nature of their duties, staff has much more frequent and close contact with the inmates they supervise than these segregation unit inmates have with one another.

(Doc. 45 at 2-3).

The produced reports detailing incidents occurring prior to the date of Woodyard's assault, July 24, 2012,[14] (Doc. 45-6 at 1-10) indicate the following occurrences of inmate-on-inmate violence since August 2010:

---

[13] The response was filed June 24, 2013.

[14] Incidents occurring after the assault are not relevant for purposes of Woodyard's deliberate indifference claims. *Cf. Harrison*, 746 F.3d at 1296 n.11 ("Because Harrison was assaulted on August 6, 2008, any incident that occurred after that date is not probative of whether Harrison was denied his constitutional rights. We therefore only consider the incident reports for assaults that occurred prior to the August 2008 assault.").

| Incident # | Date of Incident | Summary of Incident |
|---|---|---|
| HCF-11-00305 | May 12, 2011 | inmate assaulted staff and another inmate by throwing urine and feces |
| HCF-11-00394 | April 6, 2011 | inmate assaulted "inmate runners" by throwing water and wet clothes |
| HCF-11-00411 | April 11, 2011 | unarmed fight between 2 inmates |
| HCF-11-00603 | June 4, 2011 | inmate threw urine and feces at staff and inmate helper serving meals |
| HCF-11-00858 | August 1, 2011 | inmate tackled another inmate and stabbed him in back of head with broken ink pen |
| HCF-11-01094 | September 17, 2011 | unarmed inmate-on-inmate assault |

In a document styled "Motion for Oder [sic] of Judgment against Defendants for Failure to Disclose Complete Records, or documents as pursuant to Rule 37 Fed. R. of Civ. Pro.," " Woodyard has objected, *inter alia,* to the Defendants' failure to produce records from prior to August 2010. [15] (*See* Doc. 47). However, he does not appear to dispute that the incident reports the Defendants have produced accurately cover the incidents occurring since then. (*See generally id.*). These reports indicate that, between August 2010 and July 24, 2012, there had been only one incident of inmate-on-inmate assault involving a manufactured weapon in the

---

[15] Woodyard asserts that Holman's admitted failure to maintain records of assault from 2003 to 2007 violates the injunction issued in *Pugh v. Locke*, 406 F. Supp. 318, 333-34 (M.D. Ala. 1976), *aff'd and remanded sub nom., Newman v. State of Alabama*, 559 F.2d 283 (5th Cir. 1977), *cert. granted in part, judgment rev'd in part sub nom.*, Alabama v. Pugh, 438 U.S. 781 (1978) (Alabama officials "shall keep accurate records of incidents of violence which come to their attention, and all assaults and other offenses punishable under the laws of Alabama shall be reported forthwith to the local district attorney. Accurate records shall be kept reflecting the disposition of such incidents by prison authorities and any resultant criminal prosecutions undertaken.").

Segregation Unit/Annex and the Segregation Exercise Yard of Holman. Moreover, that weapon was a broken pen, rather than a metal knife or shank. Even if records from prior to August 2010 showed more rampant inmate-on-inmate assault involving weapons, the record evidence indicates that this had ceased to be a significant occurrence in the approximately two years proceeding the assault on Woodyard.[16]

The record evidence in this action regarding inmate-on-inmate assaults with weapons is even weaker than that presented in *Harrison v. Culliver*, 746 F.3d 1288 (11th Cir. 2014), which the Eleventh Circuit found demonstrated neither an objectively substantial risk of serious harm nor a pattern of activity sufficient to put officials on constructive notice of a problem. The plaintiff in *Harrison*, also a Holman inmate, had his throat cut with a knife by another inmate and nearly died. The Eleventh Circuit affirmed the grant of summary judgment in favor of Holman's warden on the inmate plaintiff's claim of deliberate indifference to excessive inmate-on-inmate violence, noting as follows:

> [I]ncident reports indicate that only four assaults occurred on the back hallway from 2005 until the day Harrison was assaulted. "We accept that an excessive risk of inmate-on-inmate violence at a jail creates a substantial risk of serious harm; occasional, isolated attacks by one prisoner on another may not constitute cruel and unusual punishment, [but] confinement in a prison where violence and terror reign is actionable." *Purcell ex rel. Estate of Morgan v. Toombs Cnty., Ga.,* 400 F.3d 1313, 1320 (11th Cir. 2005) (alteration in original) (internal

---

[16] The undersigned construes Woodyard's "Motion for Oder [sic] of Judgment" (Doc. 47) as a motion for sanctions under Federal Rule of Civil Procedure 37(b)(2)(A). That rule provides that the court "**may** issue further just orders" if a party "fails to obey and order to provide or permit discovery…" (emphasis added). Upon consideration, the undersigned does not find such sanctions to be warranted. Thus, it is **RECOMMENDED** that the motion (Doc. 47) be **DENIED**.

quotation mark omitted). Although assaults did occur throughout Holman, and some did involve weapons fashioned out of a utility knife, box cutter, or razor,[FN17] the evidence of inmate-on-inmate assault involving weapons does not does not [sic] indicate that inmates were "exposed to something even approaching the constant threat of violence." *See id.* at 1321 (internal quotation marks omitted). Holman is a large institution—according to the District Court's undisputed finding, Holman housed between 830 and 990 inmates during the relevant time period—and the thirty-three incidents involving weapons, only four of which occurred on the back hallway, are hardly sufficient to demonstrate that Holman was a prison "where violence and terror reign." *See id.* at 1320 (quoting *Woodhous v. Virginia,* 487 F.2d 889, 890 (4th Cir. 1973)).

> FN17 – Of the 33 assaults involving weapons that occurred throughout all areas of Holman between 2005 and the day Harrison was assaulted, 11 involved some sort of weapon fashioned from a razor or box cutter. The incident reports do not clearly indicate whether the knives were made from razors used for shaving or from box cutters in the craft shop.
>
> ...
>
> The limited number of assaults involving weapons fashioned from box cutters or razor blades—around eleven of a total thirty-three assaults involving weapons over a three year period—is insufficient to establish that Warden Culliver was constructively aware of a pattern of detention officers failing to follow the Standard Operating Procedures. Although we are unable to pin down precisely how many assaults involved box cutters procured through the hobby shop—five incident reports indicate that a box cutter was used, but they do not indicate from where the inmate obtained the box cutter—the record fails to demonstrate that any lapses in oversight of cutting instruments created a substantial risk of excessive inmate-on-inmate violence...

*Harrison*, 746 F.3d at 1299-301 (some footnotes omitted).

Because the record evidence in this action regarding inmate-on-inmate assaults with weapons is similarly insufficient to demonstrate either an objectively substantial risk of serious harm or a pattern of activity sufficient to put officials on

constructive notice of such a problem, Woodyard's deliberate indifference claims against the Supervisor Defendants regarding inmate-on-inmate attacks must fail.

In recommending that Woodyard be denied a preliminary injunction directing ADOC to remove him from any proximity to his attacker (a recommendation which the District Judge adopted (*see* Doc. 52), the undersigned noted, in relevant part:

> Other than a general contention that he is at "high risk" of being attacked again by Anderson (doc. 4 at 3), Woodyard has failed to present any evidence regarding irreparable injury by the defendants' refusal to transfer either plaintiff or his enemy from the close custody under which each is being held within the same segregation unit. Moreover,…he has presented no evidence that he is in fact likely to be subject to further injury by Anderson or any other inmate while in his present segregation custody. *Cf.* Doc. 45-1 and Doc. 46 at 1. Defendants have, however, produced evidence that Woodyard and Anderson have no contact and that procedures are in place to ensure Woodyard's safety and prevent contact between the two inmates.

(Doc. 48 at 5-6).

Similarly, on summary judgment, Woodyard relies only on general contentions that he is at substantial risk of being attacked by Anderson again by being housed in the same annex. While Woodyard points to evidence he claims shows that he and Anderson have come into contact with each other since the attack while they are being held in segregation (e.g. in the shower and the exercise yard), he has presented no evidence indicating either that another attack is likely or that the Supervisor Defendants' are not taking reasonable measures to prevent another attack. Moreover, the continued existence of a violent grudge between the two men is rendered suspect by the fact that Woodyard has been able to obtain an affidavit from Anderson, in which Anderson readily admits to attacking Woodyard,

to support his claims in this action.  Thus, Woodyard has failed to demonstrate an objectively substantial risk of serious injury in being housed in the same annex as Anderson.

Woodyard has also asserted claims for failure to train against all Supervisor Defendants except Howard.

> [This] alternative claim for relief—that [all Supervisor Defendants except Howard] failed to adequately train the [prison] officers—implicates a different, albeit very similar, rule: under § 1983, a supervisor can be held liable for failing to train his or her employees "only where the failure to train amounts to deliberate indifference to the rights of persons with whom the [officers] come into contact." *City of Canton, Ohio v. Harris,* 489 U.S. 378, 388, 109 S. Ct. 1197, 1204, 103 L.Ed.2d 412 (1989); *see also Belcher v. City of Foley, Ala.,* 30 F.3d 1390, 1397 (11th Cir.1994) ("A supervisory official is not liable under section 1983 for an injury resulting from his failure to train subordinates unless his failure to train amounts to deliberate indifference to the rights of persons with whom the subordinates come into contact and the failure has actually caused the injury of which the plaintiff complains." (internal quotation marks omitted)). Thus, a plaintiff alleging a constitutional violation premised on a failure to train must demonstrate that the supervisor had "actual or constructive notice that a particular omission in their training program causes [his or her] employees to violate citizens' constitutional rights," and that armed with that knowledge the supervisor chose to retain that training program. *Connick v. Thompson,* —— U.S. ——, ——, 131 S. Ct. 1350, 1360, 179 L. Ed. 2d 417 (2011).

*Keith v. DeKalb Cnty., Georgia*, 749 F.3d 1034, 1052 (11th Cir. 2014)

"As the Supreme Court has indicated, '[a] [supervisor's] culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train.' " *Id.* at 1053 (quoting *Connick*, 131 S. Ct. at 1359).  "To establish that supervisor was on actual or constructive notice of the deficiency of training, '[a] pattern of similar constitutional violations by untrained employees is ordinarily

necessary.' "[17] *Id.* at 1052-53 (quoting *Connick*, 131 S. Ct. at 1360 (internal citations omitted)). In support of his failure-to-train claims, Woodyard offers little beyond general, conclusory allegations that Holman guards are ill-prepared to handle inmate-on-inmate violence, and the above-discussed record evidence does not support a conclusion that the Supervisor Defendants were on notice of a particular problem with prison guards' training. *Cf. id.* at 1053-54 ("Keith's claim that Sheriff Brown violated Cook's constitutional rights by failing to adequately train detention officers is especially tenuous because not only does she fail to demonstrate that Sheriff Brown was on notice, she also fails to demonstrate how better training would have prevented the incident leading to Cook's death."). Therefore, Woodyard's failure-to-train deliberate indifference claims also fail.

Accordingly, because Woodyard has failed to present evidence showing that the Supervisor Defendants committed unconstitutional deliberate indifference, the undersigned **RECOMMENDS** that the Defendants' summary judgment be

---

[17]

> Although the Supreme Court has left open the possibility that a single incident may prove sufficient to hold a supervisor liable for a failure to train, *see City of Canton, Ohio v. Harris,* 489 U.S. 378, 390 n.10, 109 S. Ct. 1197, 1205 n.10, 103 L. Ed. 2d 412 (1989), [the undersigned] decline[s] to use this case as the vehicle for flushing out the Supreme Court's hypothetical basis for § 1983 relief. In *Canton,* the Supreme Court hypothesized a police force that gives officers firearms but fails to provide any training regarding the constitutional limitations on the use of deadly force, concluding that the need to provide such training would be "so obvious" that the failure to do so could amount to deliberate indifference. *Id.* It is not similarly obvious that the "failure to train" at issue in this case amounts to deliberate indifference.

*Keith,* 749 F.3d at 1053 n.56 (11th Cir. 2014).

**GRANTED** as to his deliberate indifference claims against the Supervisor Defendants.[18]

### b.    Retaliation

A large portion of Woodyard's response in opposition to the Defendants' motion for summary judgment is dedicated to argument in support of his retaliation claims against Patterson and Howard.[19]   (Doc. 42 at 4-10).   "It is an established principle of constitutional law that an inmate is considered to be exercising his First Amendment right of freedom of speech when he complains to the prison's administrators about the conditions of his confinement. *See, e.g., Farrow v. West,* 320 F.3d 1235, 1248 (11th Cir. 2003). It is also established that an inmate may maintain a cause of action against prison administrators who retaliate against him for making such complaints. *Id....See also Boxer X v. Harris*, 437 F.3d 1107, 1112 (11th Cir. 2006) ('First Amendment rights to free speech and to petition the government for a redress of grievances are violated when a prisoner is punished for

---

[18] Because Woodyard has not presented evidence of a constitutional violation on his deliberate indifference claims against the Supervisor Defendants, it is unnecessary to further address qualified immunity as to those claims. *See Harrison*, 746 F.3d at 1299 n.15 ("Because we conclude that Harrison has failed to establish that the defendants violated any of his constitutional rights, 'there is no necessity for further inquiries concerning qualified immunity.'" (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).

[19] In his response in opposition, Woodyard now claims that he is asserting claims for retaliation "against all the defendants named in complaint (except Defendant Leggett). (Doc. 42 at 4).   However, Woodyard's operative Complaint (Docs. 16, 17) clearly asserts retaliation claims only against Patterson and Howard.   As mentioned *supra*, n.2, Woodyard may not amend his complaint to assert new claims through argument in opposition to summary judgment.   Regardless, any claim for retaliation against additional Supervisor Defendants fails for the same reasons such claims fail against Patterson and Howard, *see infra*.

filing a grievance concerning the conditions of his imprisonment.')..." *Smith v.*

*Mosley*, 532 F.3d 1270, 1276 & n.15 (11th Cir. 2008).

> An inmate must establish three elements to prevail on a retaliation claim. *Bennett[ v. Hendrix]*, 423 F.3d [1247,] 1250[ (11th Cir. 2005)]. The inmate must prove that: (1) "his speech or act was constitutionally protected"; (2) "the defendant's retaliatory conduct adversely affected the protected speech"; and (3) "there is a causal connection between the retaliatory actions and the adverse effect on speech." *Id.* To establish causation, the plaintiff must show that the defendant was "subjectively motivated to discipline" the plaintiff for exercising his First Amendment rights. *Smith v. Mosley,* 532 F.3d 1270, 1278 (11th Cir. 2008). "[O]nce the plaintiff ... establish[es] that his protected conduct was a motivating factor behind any harm, the burden of production shifts to the defendant. If the defendant can show that he would have taken the same action in the absence of the protected activity, he ... prevail[s] on ... summary judgment." *Id.* (quotation marks omitted).

*Moton v. Cowart*, 631 F.3d 1337, 1341-42 (11th Cir. 2011).

> Moreover, the Eleventh Circuit has recognized:

> "Running a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources." *Turner v. Safley,* 482 U.S. 78, 84-85, 107 S. Ct. 2254, 2259, 96 L. Ed. 2d 64 (1987). Prison officials are therefore "accorded latitude in the administration of prison affairs." *Cruz v. Beto,* 405 U.S. 319, 321, 92 S. Ct. 1079, 1081, 31 L. Ed. 2d 263 (1972). This latitude includes "the withdrawal or limitation of many [inmate] privileges and rights." *Pell v. Procunier,* 417 U.S. 817, 822, 94 S. Ct. 2800, 2804, 41 L. Ed. 2d 495 (1974) (quotation marks and citation omitted). This means that an inmate's First Amendment right to free speech is not protected if affording protection would be inconsistent with the inmate's "status as a prisoner or with the legitimate penological objectives of the corrections system." *Id.*

*Mosley*, 532 F.3d at 1277.

Woodyard claims that, as a result of the July 24, 2012 assault, he "was

arrested and charged for fighting with a weapon[,]" but was later "found not guilty

of the rule violations the defendants charged him with." (Doc. 42 at 4). He

represents that, despite this finding of not guilty, he "was still placed in punitive confinement" – specifically, "close custody," which "is the most severe custody status ADOC uses at present. (*Id.*). In "close custody," "privileges are restricted[ and] rehabilitation courses 'are not' possible, because [Woodyard] is confined to segregation…" (*Id.* at 5). For instance, visitation privileges in close status are restricted to one visit every 6 months, as opposed to being allowed one visit every 90 days in medium status or a visit every other week in general population. (*Id.*). Canteen privileges are similarly restricted. (*Id.*).

Documents from Woodyard's ADOC institutional file indicate that, with Patterson's approval, Woodyard was put in close custody because, while "Woodyard was found not guilty of the fighting with a weapon disciplinary due to his wounds were considered to be defensive," investigation of the July 24, 2012 attack "determined that []Woodyard initiated the confrontation by approaching the other inmate with a knife trying to collect money. Per ADOC Classification Manual 5.2.2.2- Institutional demonstration of violent behavior such as assault with a weapon or assault causing serious injury requires confinement in Close custody for at least twelve (12) months." (Doc. 29-1 at 23-24).

Woodyard has not demonstrated a claim for retaliation in regards to his being placed on close status, as he does not claim that his being placed on closed status was the result of any constitutionally protected speech or act. Rather, Woodyard instead appears to be asserting a claim that he was denied due process when conduct for which he was apparently found not guilty at a disciplinary

hearing was still used to justify placing him on heightened restriction.[20] The

Supreme Court has described such a claim as follows:

> The Fourteenth Amendment's Due Process Clause protects persons
> against deprivations of life, liberty, or property; and those who seek to
> invoke its procedural protection must establish that one of these
> interests is at stake. A liberty interest may arise from the Constitution
> itself, by reason of guarantees implicit in the word "liberty," see, *e.g.,*
> *Vitek v. Jones,* 445 U.S. 480, 493-494, 100 S. Ct. 1254, 63 L. Ed. 2d 552
> (1980) (liberty interest in avoiding involuntary psychiatric treatment
> and transfer to mental institution), or it may arise from an expectation
> or interest created by state laws or policies, see, *e.g., Wolff v.*
> *McDonnell,* 418 U.S. 539, 556-558, 94 S. Ct. 2963, 41 L .Ed. 2d 935
> (1974) (liberty interest in avoiding withdrawal of state-created system
> of good-time credits).

> We have held that the Constitution itself does not give rise to a liberty
> interest in avoiding transfer to more adverse conditions of
> confinement. *Meachum v. Fano,* 427 U.S. 215, 225, 96 S. Ct. 2532, 49
> L.Ed.2d 451 (1976) (no liberty interest arising from Due Process
> Clause itself in transfer from low-to maximum-security prison because
> "[c]onfinement in any of the State's institutions is within the normal
> limits or range of custody which the conviction has authorized the
> State to impose"). We have also held, however, that a liberty interest in
> avoiding particular conditions of confinement may arise from state
> policies or regulations, subject to the important limitations set forth in
> *Sandin v. Conner,* 515 U.S. 472, 115 S. Ct. 2293, 132 L. Ed. 2d 418
> (1995).

> *Sandin* involved prisoners' claims to procedural due process protection
> before placement in segregated confinement for 30 days, imposed as
> discipline for disruptive behavior. *Sandin* observed that some of our
> earlier cases, *Hewitt v. Helms,* 459 U.S. 460, 103 S. Ct. 864, 74 L. Ed.
> 2d 675 (1983), in particular, had employed a methodology for
> identifying state-created liberty interests that emphasized "the
> language of a particular [prison] regulation" instead of "the nature of
> the deprivation." *Sandin,* 515 U.S., at 481, 115 S. Ct. 2293. In *Sandin,*
> we criticized this methodology as creating a disincentive for States to
> promulgate procedures for prison management, and as involving the
> federal courts in the day-to-day management of prisons. *Id.,* at 482-

---

[20] Woodyard appears to grasp this, as he asserts he is being punished "for no reason and
this is a gross violation of Plaintiff (14th Amend.) constitutional right."  (Doc. 42 at 5-6).

483, 115 S. Ct. 2293. For these reasons, we abrogated the methodology of parsing the language of particular regulations.

> "[T]he search for a negative implication from mandatory language in prisoner regulations has strayed from the real concerns undergirding the liberty protected by the Due Process Clause. The time has come to return to the due process principles we believe were correctly established in and applied in *Wolff* and *Meachum.* Following *Wolff,* we recognize that States may under certain circumstances create liberty interests which are protected by the Due Process Clause. But these interests will generally be limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.,* at 483-484, 115 S. Ct. 2293 (citations and footnote omitted).

> After *Sandin,* it is clear that the touchstone of the inquiry into the existence of a protected, state-created liberty interest in avoiding restrictive conditions of confinement is not the language of regulations regarding those conditions but the nature of those conditions themselves "in relation to the ordinary incidents of prison life." *Id.,* at 484, 115 S. Ct. 2293.

*Wilkinson v. Austin*, 545 U.S. 209, 221-23 (2005).

While Woodyard has alleged (in his unsworn response in opposition to summary judgment) that being in close status imposes certain hardships on him, including reduction in visitations, canteen privileges, and rehabilitation programs, none of them appear to be more "atypical and significant…in relation to the ordinary incidents of prison life." *Compare Moulds v. Bullard*, 345 F. App'x 387, 396 (11th Cir. 2009) ("Temporary withdrawal of visitation privileges for disciplinary purposes is 'not a dramatic departure from accepted standards for conditions of confinement,' but a claim of permanent or extended withdrawal of all visitation

privileges 'would present different considerations.' *Overton v. Bazzetta,* 539 U.S. 126, 136-37, 123 S. Ct. 2162, 156 L. Ed. 2d 162 (2003). []As applied here, the conditions of Moulds's disciplinary confinement are not of constitutional dimensions. His temporary loss of privileges does not rise to the level of a protected liberty interest. *See Overton,* 539 U.S. at 136-37, 123 S. Ct. 2162. Although he was deprived of one meal per day, he has not alleged facts showing that his diet, taken as a whole, was inadequate. He also alleged that he was deprived of a mattress for approximately half of each day, but he did not allege that he was not allowed to sleep on a mattress. Under the circumstances, particularly in proportion to the length of Moulds's sentence, the 201 days he spent in segregation and subject to these conditions did not constitute such a 'dramatic departure' from ordinary prison life as to give rise to a protected liberty interest. *See id.* Accordingly, the district court did not err in denying this claim."), *with Wilkinson*, 545 U.S. at 223-24 ("For an inmate placed in [the Supermax Ohio State Penitentiary], almost all human contact is prohibited, even to the point that conversation is not permitted from cell to cell; the light, though it may be dimmed, is on for 24 hours; exercise is for 1 hour per day, but only in a small indoor room. Save perhaps for the especially severe limitations on all human contact, these conditions likely would apply to most solitary confinement facilities, but here there are two added components. First is the duration. Unlike the 30-day placement in *Sandin,* placement at OSP is indefinite and, after an initial 30-day review, is reviewed just annually. Second is that placement disqualifies an otherwise eligible inmate for parole consideration.

While any of these conditions standing alone might not be sufficient to create a liberty interest, taken together they impose an atypical and significant hardship within the correctional context. It follows that respondents have a liberty interest in avoiding assignment to OSP." (internal citation omitted)).  As such, Woodyard's claims regarding being placed in close status, whether in retaliation or in deprivation of due process, fail.

Woodyard also claims that Defendant Howard retaliated against him for complaining about being housed in the same annex as Anderson.  In his (unsworn) response in opposition to summary judgment, Woodyard details the following incident:

> On 9-11-12 Plaintiff confronted Captain Howard (defendant) about moving him out of the annex because he felt threatened living in the same unit as his attacker.  Defendant Howard got extremely upset and radioed for more officers.  She then ordered the officers to strip plaintiffs [sic] cell.  When Plaintiff ask [sic] her why she ordered the officers to take his property.  I was told by defendant Howard to 'shut up.'  Plaintiff then asked to speak to the warden and was struck in the face (by Defendant Howard) and 'drug' up the floor by the 6 officers called by defendant Howard, after which he (plaintiff) was 'slapped' in the face and 'spit on' by defendant Howard.

> …Plaintiff was handcuffed behind the back, surrounded by defendant Howard and 6 more correctional officers…Upon plaintiffs [sic] return from the infirmary (where he was given a body chart and x-rays of his (plaintiff) face) plaintiff was placed in the strip cell where he remained for 7 days, with no bedding, matt, clothes nor, toiletries and at times had to lay in the cell with his waste for 2 days at a time because the CO's wouldn't turn on the water so plaintiff could flush his toilet.

(Doc. 42 at 9-10).

In support of these allegations, Woodyard has submitted the affidavit of inmate Jarell Price, who swears that, "on or about Sept. 11 2012 [he] did witness

and altercation take place between inmate Draper Woodyard and Captain Ronzella Howard[,]" in which "Howard an [sic] 6 more CO's jump[ed] inmate Woodyard and strip his cell of all his property…" (Doc. 42 at 20). Woodard purportedly asked Howard "why she ordered the taking of his property and he was told to shut up. He ask [sic] to see the warden an [sic] was hit in the face and drug up the floor." (*Id*.). After Woodyard was "return[ed] from where-ever they took him they put him in the naked cell for about a week." (*Id*.).

However, any mention of such an incident occurring is absent from Woodyard's operative complaint (Docs. 16 – 17). In the main complaint (Doc. 16), which is dated November 15, 2012 (approximately two months following the alleged incident involving Howard and the six other guards), the only factual allegation in support of a claim of retaliation against Howard is that, in response to Woodard sending "request[s] and complaints to Howard and her supervisors asking to be removed from this hostile living arrangement[,]" Howard purportedly "threatened retaliation against [Woodyard] by stating "If you keep bothering me about moving, you will be wrote a disciplinary and that's just the beginning." (Doc. 16). The supplement to the main complaint (Doc. 17), dated December 3, 2012, makes no mention of retaliation at all, let alone the incident described above involving Howard and the six other guards.[21]

At most, then, Woodyard's operative complaint (Docs. 16 – 17), which contains detailed factual allegations supporting each of his claims, alleged only a

---

[21] Moreover, no mention of this incident is made in any of Woodyard's previous pleadings filed after September 11, 2012 (Docs. 4, 7, 8, 11, 12, 13, 14).

threat of retaliation by Howard. Though the two documents comprising the operative complaint were drafted several months following the incident involving Howard and the six guards, Woodyard has made no attempt to explain why any mention of this incident was not included in his complaint. It is clear that Woodyard is attempting to add an additional claim against Howard through his summary judgment response, which the Eleventh Circuit has held to be procedurally improper. *See supra*, n.4 (citing *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004)).

Accordingly, the undersigned **RECOMMENDS** that the Defendants' motion for summary judgment be **GRANTED** as to Woodyard's claims for retaliation and deprivation of due process.

## V. <u>Conclusion</u>

In accordance with the above-stated reasoning, the undersigned Magistrate Judge **RECOMMENDS** that 1) the Defendants' motion for summary judgment (*see* Docs. 29 – 31) be **DENIED** as to Woodyard's claim of failure-to-protect deliberate indifference against Leggett in his individual capacity and that it be **GRANTED** as to all other claims; and 2) that Woodyard's "Motion for Oder [sic] of Judgment" (Doc. 47), construed as a motion for sanctions under Federal Rule of Civil Procedure 37(b)(2)(A) be **DENIED.**

## VI. <u>Notice of Right to File Objections</u>

A copy of this report and recommendation shall be served on all parties in the manner provided by law. Any party who objects to this recommendation or

anything in it must, within fourteen (14) days of the date of service of this document, file specific written objections with the Clerk of this Court. *See* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72(b); S.D. ALA. L.R. 72.4. In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the Magistrate Judge's report and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the Magistrate Judge is not specific.

     **DONE** this the 22nd day of August 2014.

                     */s/ Katherine P. Nelson*
                     **KATHERINE P. NELSON**
                     **UNITED STATES MAGISTRATE JUDGE**